Next we will hear on Wendy Cunning v. Skye Bioscience, Inc. Wendy Cunning v. Skye Bioscience, Inc. Good morning, Ms. Voigt. Good morning, Your Honor. May it please the Court, I'd ask to reserve three minutes of my time for rebuttal, if I may. Very well. My name is Ann Voigt, and I represent Appellant Skye Bioscience. The evidence at trial showed that Ms. Cunning was terminated because her skills lay in marketing, and Skye, an early-stage biopharmaceutical company, had nothing to market. Would you slow down, please? You're going so quickly that I'm missing what you're saying. Certainly. And I'll give you some advice that Judge Berzon gave to other counsel, which is it's sometimes better just to argue your case instead of reading your notes, because we want to hear from you. I really want to hear what you're thinking about this case, but you do what you need to do. Certainly, Your Honor. What I was going to say was that the evidence at trial showed that Ms. Cunning was terminated because her skills no longer fit the needs of the company, not for any other reason. And the reason that the jury reached a contrary verdict is based on four critical errors that the district court committed, any one of which would warrant relief, but all of which combined compel reversal. So I'd like to begin, if I may, with the evidentiary issues, because I think those are sort of the threshold core issue. What the court did was it allowed in evidence that was entirely irrelevant to the substance of Ms. Cunning's claims. It did so, even though that evidence was deeply prejudicial, and it did so over Skye's objection. That evidence included testimony that she believed that the board of directors included members who had had dealings with the Russian mafia, with the Canadian mafia, that one of them had brandished a gun, and, most critically, that — But, Ms. Voigt, what questioning brought that into relevance other than saying to Ms. Cunning, as she was asked in cross-examination, you didn't tell anybody else except Murphy? And she said, that's right. I didn't tell anybody else except Murphy. So you opened the door to the question, why didn't you tell anybody else than Murphy? And the answer is, because they were all crooks, right? Well, Your Honor, if I may, I have two responses to that. Did they open the issue by asking why didn't she ask, or did you do so — or, pardon me, the trial counsel opened the door by asking why? Your Honor, they began with it. All of this came in in opening — in their opening statement. It was the first thing that the jury heard was — in opening statement was about the alleged misdeeds of Avtar Dillon. And so — Did you object to that, saying that that was irrelevant? Your Honor, yes, they had objected in their motion in Lemonnet. We objected based on relevance and 403 grounds. The court denied that. And we would submit that that was more than sufficient to raise the issue. Once that came in, first off, Skye had also said that complaining to Mr. Murphy, to Dr. Murphy, was enough. Second, even if the court nonetheless thought it was necessary for it to come in, there were absolutely no limiting instructions given that would actually tell the jury what purpose it should consider it for and that it should only consider it for her state of mind. Instead, what Ms. Cunningham did and what her counsel did was to say that this was a group of people who all did bad things, and therefore they should believe that they had also done this bad thing. That was improper, and the court should not have allowed it. With respect to the evidence that came in, that included not just the allegations about involvement with the Russian and Canadian mafias. It also included detailed evidence about Avtar Dillon's unrelated criminal convictions. And it is difficult to overstate that prejudice to Skye in this case because, again, it came in with no instructions for the jury. It came in against a case where there was very little evidence affirmatively to support her case. There was a request of an instruction to the jury that they would consider Mr. Dillon's refusal to testify and draw an adverse inference from that, and the judge refused to give it. That is correct. The court also, however, did not tell them for what purpose they could consider that. The court never told the jury you should consider this only for purposes of her state of mind. To the jury's impression, they could consider the evidence of Avtar Dillon's guilty plea, of the allegations about involvement with the mafia, and the allegations about Mr. Heppel brandishing a gun for any purpose that they chose. And they plainly did. Should the district court have instructed Mr. Dillon to testify, to answer the questions? He couldn't answer the question as to whether at one time it possessed a medical license. Your Honor, I think that is, as we pointed out, in Skye's opposition to the motion in Lemonnet, there should have been a question-by-question assessment. First, was the invocation warranted? Skye had an opportunity to cross-examine Mr. Dillon and did examine him, even though he invoked the Fifth every time Skye examined him. We think at that point the damage was done. At that point, there had been a series of questions asked by plaintiff's counsel to which he had invoked, even on the most tenuous of grounds, his Fifth Amendment rights. The fact that he was allowed to do that in front of the jury was wrong. The fact that there was no attempt to assess outside the presence of the jury whether that invocation was proper was wrong. And again, the prejudice of that was enormous and can't be overstated. The argument that, in fact, was one that plaintiff's counsel returned to time and time again, in opening, throughout trial, with virtually every witness that they questioned, and in closing. We think for that reason that those evidentiary issues are reason enough to reverse. Should the district court or what should the district court have done? Should the district court have just simply barred Dillon's testimony altogether? I think, yes. As an initial matter, yes, it should have. At a minimum, it should have simply allowed there to be a statement that he had invoked the Fifth. It should have tested whether that invocation was proper, particularly for questions that were related to the claims here, because that was deeply prejudicial for him to  On the question as to whether he should have barred Mr. Dillon altogether, he should have barred him because he was going to invoke the Fifth or because he was irrelevant. I think either would be an adequate basis. But he surely is relevant. I think in this case, this is a very, very small operation. This guy's chairman of the board. It was a very small operation. We agree. But as to whether it was more prejudicial than probative, absolutely. But it surely was. It surely would have been probative to the question as to whether he knew anything about about cunning, perhaps the nature of their relationship, what kind of contact he had with her. It would have been relevant as to whether as to whether he was involved in it, whether there was any reason to justify her concerns that she could not go to the board of directors because they were worse than Murphy. And I think in that case, what the court could have done was to actually test which questions were appropriate for Mr. Dillon, for Dr. Dillon to invoke the Fifth. But it didn't. It let it in entirely unfettered from any instructions to the jury. But give me an example of a couple of questions that the district court should not have permitted under any circumstances that were deeply prejudicial. Certainly, I think the questions that were unrelated to Miss Cunning's claims, the questions about his unrelated conviction. OK, so we've got the we've got the SEC action. But why isn't that? Why wouldn't that be relevant to her claim that she had heard rumors that the board of directors, you know, the people on the board of directors were engaged in some funny business and therefore she could not go to them to report on on what she thought was Murphy's bad behavior? Because critically, it was a function of timing. These the conviction itself came and the charges came long after. But she might have been aware of that. She might have been aware of rumors of conduct that that suggested that there was that she could not reliably go to the board of directors and complain. But what the court let in was not just what she said she had heard. It led in the Citroen report, which detailed allegations not just against Avtar Dylan, but against other members of the board of directors. It also led in the evidence of the subsequent charges against Dr. Dylan and the guilty plea, I thought. Right. And the guilty plea. That is correct. And not just testimony about it, but also the documents themselves. And on the timing, as I understand it, not only was the charges against Mr. Dylan regarding a different company, but they were lodged two years after Miss Cunningham had been terminated. Yes, Your Honor, that's exactly correct. And that, we think, makes the argument that it was relevant to her state of mind even more tenuous, because how could it have affected her state of mind if it was something that happened later and at a separate company? So we think, given the prejudice there, that under any reasonable 403 analysis, it should have been excluded. I'm certainly happy to continue addressing the evidentiary issues, but if I might, I'd like to take a few minutes to address some of the other issues that we've also raised, specifically the request for bifurcation, the emotional distress damages, and the statute of limitations defense. With respect to bifurcation, it is correct that both parties asked for bifurcation. Sky explained why it thought it was appropriate. And simply by looking at the trial record, one can see not just some of the evidence that came in about financial condition, which was one of the reasons that Sky advanced, but also the evidence about the criminal charges, which were at most relevant, as the Court had pointed out, to refuting one of Sky's arguments on liability. It had nothing to do with the punitive damages, which were tied to this particular conduct, not generalized bad behavior. With respect to the emotional distress issue, it is clear that you can't recover for pre-termination damages, given how she had pled her claim. The jury was told that there was no fixed standard for assessing them. And when Ms. Cunningham's counsel asked for emotional damages in closing, what they did was they said you should give her a certain amount of money per minute, and that you should calculate it over all this time. They plainly asked for, both in closing and elsewhere, for damages that applied to emotional distress incurred before. That, too, was also error. Finally, with respect to the statute of limitations defense, the Court held that it was weighed by not raising a pre-verdict Rule 50A motion. But in this case, the Court had already ruled on it as a matter of law at the motion for summary judgment. At a minimum, this Court should send it back for the Court to correctly consider it. If it was a joint judgment, both federal and state retaliation, why does that matter? Because if we support the federal judgment, the state, the error in the state law has no effect, does it? No, it does, because that is the basis for the punitive damages in this case. And so that is the relevance. I see that I'm running short on time. I have one last question with respect to Mr. Dillon. So I did note that you — that Skye did ask questions. Did you — did you ask the district judge to compel Mr. Dillon to answer any questions? We did not. So can you object on that basis here? Does that make this plain error review as to that claim? No, we think that we sufficiently raised it by challenging the prejudicial nature of having Mr. Dillon testify, whether it was by — But you didn't — but that's a — that's a sort of an interim measure, to ask him to compel him to answer certain questions. If you didn't ask Judge Carter to do that, how can you come now and complain that Judge Carter didn't compel Dillon to answer some of the questions? Because, Your Honor, I think what we can say is that in assessing the consequences of the error, what we contend is the error is that it came in at all. In assessing the consequences, the fact that the court made no attempt to parse what came in and allowed this extended questioning goes to the scope of the impact of that on the verdict. And for those reasons, we think this Court should reverse. If I may, I'd like to reserve the balance of my time. Very well. Thank you. Good morning, Mr. Lowe. Good morning. May it please the Court, Daniel Lowe on behalf of Plaintiff Appellate — You tried the case. Did you not? I did not, Your Honor. No. On the issue of the evidence of a board member of misconduct, Skye argued that one of the essential elements of the Whistleblower Protection Act claim was that she needed to report the violation to somebody other than CEO Murphy. Skye made that argument in closing, 7 E.R. 1498, and in its pre-verdict Rule 50A motion at 6 E.R. 1363. The trial court recognized that the evidence went to Cunning's state of mind and provided valid reasons for her not bringing the complaints to the board. Cunning did not make inflammatory arguments about the evidence and never argued that the board members had a propensity for wrongdoing. Why did you all need the guilty plea? You really need the guilty plea? And why isn't that prejudicial, such that we should send it back? Didn't you overtry the case? Well, I did not try the case, but the guilty plea comes in under Rule 609A2 as a crime of dishonesty. Skye argues that it — because it was before sentencing, it doesn't come in. And they cite some state court decisions on that. But the federal courts have held that a guilty plea counts as a conviction for purposes of Rule 609, even before sentencing. And they raised the issue in their reply brief, so we didn't get a chance to respond. But the 11th Circuit and 10th Circuit have addressed this. Mr. Lowe, can I interrupt you for a second? Would you please walk me through this? If the guilty plea takes place two years after the woman has been terminated, what relevance does it have as to why she didn't tell her complaints to Mr. Dillon? Two responses to that, Your Honor. One, under Rule 609, it's allowed for impeachment purposes. It's what? Allowed for impeachment purposes, because he was a witness. You're impeaching Dillon, who doesn't testify? He did take the stand, Your Honor. He said he wouldn't testify. He answered a couple questions at the beginning. Yeah, it was his name. Sure. Under Rule 609, the question is whether he was a witness, and he was a witness. And the second response, Your Honor, is she testified to being told about these rumors of wrongdoing by Mr. Dillon and others. And the plea and judgment corroborate that testimony. How does a two-year plea, which hasn't occurred yet, corroborate that she thought that Dillon was a crook two years before? Well, it certainly makes more likely that she was telling the truth. Why does it make more likely if he didn't commit the act until two years later? Why does she say, oh, it's legitimate now because I always suspected that he was a crook? The conduct that he pleaded guilty to occurred earlier. How do you know that? There's a plea agreement that came later. He pled guilty to — Did she know that? Where's the evidence that she knew that? There isn't any. Okay. But that's the point, is it corroborated that she knew — she was told about his conduct. After she'd been terminated. Well, after — Years after she was terminated. After he was terminated, it was corroborated that he was engaged in misconduct. But let's assume that — let's just follow your train of thought here, that it was relevant. Let's assume for a second that it is for argument's sake. But why wasn't there a jury instruction here? And isn't it error that there wasn't to explain to jury how they could use this particular piece of evidence? Well, there wasn't a jury instruction because the jury instruction was not requested. And it's not plain error because, for example, when Ms. Cunning referenced the evidence in closing — Well, so a jury can consider that evidence. This is a bad dude over here. So we're going to rule in this way. I mean, the jury instruction should be able to advise the jury how they can use that particular piece of really, it appears, prejudicial information, don't they? Well, yes, a jury instruction could have done that. But the way it was used at trial, she made clear the purpose of introducing the evidence. Didn't you — didn't the defendant — pardon, didn't the plaintiff request a jury instruction saying that the jury could take an adverse inference from a failure to testify? And wasn't that done by you? Yes. And then Judge Carter said, no, that would be too harmful. Well, then what's the relevance of him not testifying? Well, there were certainly questions about whether Mr. Dillon was involved in the termination. The relevance is that — Was involved in an SEC involvement in another case two years before she was terminated. Thank you. Go on to something else. On the issue of bifurcation, Skye had the burden of demonstrating that bifurcation was justified under the facts of the case. Skye did not carry that burden as it offered to the trial court, only a conclusive restatement that bifurcation would promote convenience and efficiency. On appeal, they may make a prejudice argument, but that wasn't an argument that was before the trial court, so it did not abuse its discretion in ruling against bifurcation. On the emotional distress damages, Cunning did testify to pre-termination emotional distress, but pre-termination emotional distress was relevant to demonstrating that Cunning was vulnerable and susceptible to emotional distress and that the termination exacerbated the pre-existing distress. But you agree that pre-termination distress was not compensable in that case? Do you not? I do, but I don't agree that the jury awarded it, and Skye can only offer speculation that— Was it argued by the plaintiff that she should get damages of pre-termination because she was terribly emotionally distressed? No, Your Honor. Plaintiff argued that—did point to her pre-termination emotional distress and then argued for emotional distress damages based on a permanent basis over a course of four years. And there was sufficient evidence to support the amount awarded based on the post-termination distress. That's a good argument. On the statute of limitations, in the proposed final pretrial conference order, Skye stated that it planned to pursue a statute of limitations defense at trial, but voluntarily chose not to do so and did not address it in the pre-verdict 50A motion. Resulting in a complete waiver of the issue. For purely legal issues, a denial of summary judgment—except for purely legal issues, denial of summary judgment can't be appealed after trial because the trial record supersedes the record on summary judgment. Here, equitable tolling— Your Honor, the record as to the statute of limitations being a state defense, right, or defense to the state action, was the same at motion of summary judgment as it was at trial. The record was identical, wasn't it? The issue was, had the statute of limitations run? Well, the issue was decided on equitable tolling grounds. And the record on— Once the judge decides that the statute of limitations will not be allowed as a legal defense to the motion of summary judgment, why is that sufficiently reserved for trial? Because the judge denied their motion for summary judgment. It did not grant the motion brought by Ms. Cunning. So the Court stated what the relevant standard was for summary judgment, that all reasonable interests must be drawn in Ms. Cunning's favor, and then applied that standard and held that under that standard, equitable tolling applied. So there was not a decision on the amount of law. Skye did raise the state standard of summary judgment as the statute of limitations of the summary judgment on punitive damages, correct? Yeah, they brought— Thank you. —up the Rules of the Law Protection Act state law claim statute of limitations. And while it's not necessary to reach the issue, the statute of limitations when civil penalties are not requested at trial would be three years, not one year. The Court decided one year because before trial, Ms. Cunning was requesting statutory or civil penalties, but at trial did not request those. On the issue of Aftar Dillon's testimony and invocation of the Fifth, Skye argues that it preserved the issue in its response to the motion in limine number 4, but that was a motion brought by Cunning, not by Skye, and it was a motion to permit the use of Aftar Dillon's live testimony. In its response, Skye advocated that Aftar Dillon be brought in to testify live in person and objected to the relevance of certain questions asked at the deposition, which does not preserve objections to the testimony at trial. Skye cites to U.S. v. Lloyd for the proposition that a general challenge to a witness's Fifth Amendment, but quotes language from that case related to the application of criminal sentencing guidelines, not an evidentiary challenge. In our brief, we cite Drayton v. Scallon, that plain error review applies when a party raises a different objection to an evidentiary issue on appeal. And there —   Counsel, let me take you back to Mr. Dillon because I think this is an interesting part of the case. So the charges to which he pled guilty and as to which he was asked and declined on Fifth Amendment grounds, did those — how far back did those charges cover? So what he was pleading guilty to, in other words, what was the time scope of that conduct, and did it cover time when Cunning was working for Skye? It did, Your Honor. So the conduct — the conduct for which he pled guilty was conduct that was — that was — that he carried on during the time that she was employed. It included — I believe it included 2018. So the guilty plea comes in, well, after she's left the company, but the conduct for which he's convicted was contemporaneous with her employment. Correct, Your Honor. It overlapped with her employment. And did any of that — so far as we know, did any of that conduct have anything to do with the Canadian mafia, with Russians? No, the Canadian mafia and Russians was a different witness and not Avatar Dillon. And did you ask — did you ask Judge Carter to compel Mr. Dillon to answer questions? No, neither side requested that, Your Honor. And you didn't ask for any limiting — for any explanatory jury instruction? Well, only the adverse inference instruction, which was — That you could infer an adverse — an adverse instruction. But — An adverse information. But that would have covered everything that he was asked about, you know, whether he had a medical license, you know, where he vacationed in the fourth grade. I mean, it would have — it covered all kinds of stuff. Some of which was relevant and some of which had nothing to do with anything. Yeah, I mean, certainly if an adverse inference instruction had been issued, it should have been tailored. But it wasn't — Because Judge Banz right, he didn't answer anything other than, is your name? That's correct. Dillon. But at the same time, Skye did not request an instruction that the jury could not draw an adverse inference, which it could have done. In his reply brief, Skye argues that in SEC v. Jasper, the case did not address the admissibility of Fifth Amendment invocations. But in fact, at page 1126 of that decision, it does. And that Court found — or this Court, Ninth Circuit — found that invocations were admissible. It did not need to be scrutinized on a question-by-question basis, at least where there were no question-by-question objections. That Court distinguished the Glanzer case. In Glanzer, the Court found that the invocations needed to be made on a question-by- question basis, not that the admissibility needed to be ruled on question-by-question. We also cite Flores-Blanco, in which this Court found no error in the district court's failure to explicitly inquire into the defendant's reasons for invoking the Fifth Amendment. Skye points out that in that case, there were two hearings related to the witness invoking the Fifth Amendment, but neither was about — neither of those hearings was about the propriety of the witness invoking the Fifth Amendment. And just as here, there were hearings about, after taking the stand and pleading the Fifth on the motion in limine and the motion for an adverse inference. So this Court was aware of the basis for the Fifth Amendment invocations and the criminal conduct. Counsel, let me see. Are there any other questions? Any other questions? Very well. Thank you for your argument. Thank you, Your Honor. Thank you, Your Honor. So I might address three points from my friend's argument. First, the very first lines of the plaintiff's closing argument were — and this is at ER 1434 — when I stood before you two weeks ago, I said that being a whistleblower can be very lonely, and this trial has proved that. This is a case about a small group of insiders, a tight-knit old-boy network comprised of Dillons, Avtar, Puneet, Jim Heppel, and Dr. Brian Murphy. They terminated — skipping the next line — they terminated her because she was a thorn in their side and she was pressing sensitive issues. They then went on to invoke all of the allegations against Avtar, Dillon, and others. So I think, simply put, this was front and center. It was a central part of the plaintiff's case from the beginning through the trial to the very end. But a central part as to what? Again, her complaint is, I didn't have any place I could go. I thought I saw — I thought I saw wrongful behavior on the part of the CEO, and I've got a four-person board, including Mr. Avtar, Dillon as the chairman and his nephew, and there are rumors rampant that these guys are engaged in bad activities other places. There was no place for me to go and complain about the CEO's behavior. Then the purpose for which it should have come in, and which the jury should have been instructed as to, was that it was coming in only for her state of mind, not as proof of those bad acts, and certainly not as underlying — Did you request an instruction on that? We did not, but we objected categorically to it, and we objected on 403 grounds. And we think that then in assessing the error and the scope of it, this court can look to the failure to provide any — If you've just raised a general — general grounds, it can't come in for anything, that doesn't feel terribly surgical. It doesn't feel terribly informative to the district court. If it's just, we don't want Dillon in here, I can understand why you didn't want Dillon to testify. Your Honor, I don't think it was simply — But to exclude it categorically feels a little bit — a little bit blunt. But that doesn't warrant an equally blunt response on the court's part. But that's why — that's why I asked if you — if you requested any kind of a limiting instruction, because that would have — that would have — that would have, you know, neutered some of the damage that was done. Well, interestingly, Your Honor, Ms. Cunning recognized the potential prejudice by requesting a limiting instruction in the motions in limine. And so we think that the issue is certainly in front of the court. We had absolutely raised the 403 issues, and so we think — So are you now arguing that it was error for the district court not to grant her motion? We think that goes to whether the — the issue of whether there was a less prejudicial way to allow it in if the court considered it — I mean, it certainly — it certainly might have — might have helped Judge Carter if you had jumped in and said, we agree with Ms. Cunning on this point. It is possible, but we also think that the scope of the error was plain. And so raising it in this way was so prejudicial, particularly the way that it was brought in repeatedly, time and time again, and particularly when weighed against the weakness of her affirmative case. If I could — If you could summarize your last two points. Of course. Because you are out of time. Yes, I apologize, Your Honor. Very, very quickly, I just wanted to address the point about the emotional distress, and if I could refer this court to page 1467 in the ER, to my colleague's point that it was not based on pre-termination emotional distress. It said, Ms. Cunning testified that this distress started with that elevator comment back in December of 2018, so it's been going on for four years. The calculations that they then proposed were based on a four-year period that began long before her actual termination, and those calculations are proposed at ER 1470. And then finally, with respect to bifurcation, I'd simply note that we did not simply make a request. There also were reasons provided. That's at ER — I'm sorry, SER 196. We think any of these errors would warrant reversal. We think cumulatively they compel it, and with that, unless there are further questions, I'm happy to submit time over time. Any other questions? No, thank you. Thank you very much to both of you. The matter of Wendy Cunning v. Sky Bioscience will be submitted.
judges: BYBEE, BEA, MENDOZA